1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| OSVALDO RODRIGUEZ, | No.  1:23-cv-01286-KES-CDB |
| Plaintiff, | |
| v. | ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| CITY OF BAKERSFIELD, OFFICER STEVEN GLENN, OFFICER TRENT ALEXANDER, AND OFFICER TYLER SCHLEICHER, | |
| Defendants. | Doc. 22 |

On September 14, 2021, while pursuing a fleeing suspect of whom they had lost sight,

officers Steven Glenn, Trent Alexander, and Tyler Schleicher of the Bakersfield Police

Department arrested plaintiff Osvaldo Rodriguez, who was then detained for 143 days before all

charges were eventually dropped.  *See* Doc. 22-2 ("Stmt. Mat. Facts") ¶¶ 14–36, 53.  Rodriguez

contends that the officers arrested him without probable cause and that the City of Bakersfield is

liable for failure to train the officers.  Doc. 20 ("FAC") ¶¶ 32–43.  Defendants move for summary

judgment on all claims.  Doc. 22-1 ("MSJ").  The Court held a hearing on December 2, 2024, and

the motion was argued and submitted.  Doc. 27.  For the reasons set forth below, the Court denies

the motion as to defendant Glenn but grants the motion as to defendants Alexander, Schleicher,

and the City of Bakersfield.

1

1    **I.    Background**

2         At around 3 a.m. on September 14, 2021, officer Tyler Schleicher was on patrol in

3    Bakersfield, California, when he noticed a blue Chevrolet Tahoe accelerate quickly out of the

4    Vagabond Inn parking lot on Knudsen Drive.  Stmt. Mat. Facts ¶¶ 1–3.  As he began to tail the

5    vehicle, the driver increased its speed to ninety miles per hour and sped through a red light, so

6    Schleicher activated his emergency lights and sirens.  *Id.* ¶¶ 4–7.  The driver did not stop and

7    continued to drive recklessly, speeding through more red lights and driving on the wrong side of

8    the street.  *Id.* ¶¶ 7–11.  The driver eventually ended up on Highway 99 traveling the wrong way,

9    toward oncoming traffic.  *Id.* ¶¶ 8–12.  Schleicher pursued for approximately three miles,[1] until

10   the driver of the Tahoe lost control and struck a traffic barrier in the middle of the highway.  *Id.*

11   ¶ 13.

12        The suspect driver hopped out of the vehicle, leapt over the highway's center divider, and

13   ran across the highway and down an embankment toward Buck Owens Boulevard.  *Id.* ¶¶ 13–15.

14   As the suspect fled down the embankment, Schleicher lost sight of him.  *Id.* ¶ 16.  Schleicher

15   broadcast over his police radio the direction the suspect was headed and described him as an adult

16   Hispanic male wearing a black t-shirt and black shorts.  *Id.* ¶ 14.  Sergeant Ryan McWilliams,

17   who was situated elsewhere, also reported seeing the suspect run down the embankment.  *Id.* ¶ 17.

18        At this point in the pursuit, the parties' proffered facts begin to diverge.  To an extent,

19   however, the Court is assisted by the video footage captured by officer Steven Glenn's body

20   camera.  Doc. 22-5, Ex. 3 ("BWC Video").

21        Defendants' version of the facts is as follows: officer Glenn saw the suspect come down

22   the embankment after sergeant McWilliams reported seeing him, and only Glenn was able to

23   pursue.  *See id.* ¶¶ 18–20, 22–23.  Glenn put his vehicle into park and began to chase the suspect

24   while calling out for him to stop.  *Id.* ¶¶ 18–20.  He saw the suspect run into the Roadrunner Inn

25   hotel, chased him inside and up a stairwell, and pursued him up the stairs based on the sound of

26

27   ---

[1]  The Vagabond Inn, located at 6100 Knudsen Drive, Bakersfield, California, *see* Stmt. Mat.
Facts ¶ 2, is approximately 2.7 miles from the Roadrunner Inn, located at 2619 Buck Owens
28   Boulevard, Bakersfield, California, where Rodriguez was arrested, *see id.* ¶¶ 13–15.

1   the suspect's footsteps.  *Id.* ¶¶ 22–24.  He followed the sound of footsteps up to the third floor,

2   but when he arrived, he did not see the suspect or hear anything else.  *See id.* ¶¶ 23–26.

3        Defendants further contend that, as Glenn scanned the third floor, plaintiff Osvaldo

4   Rodriguez opened the door to his hotel room, and Glenn immediately identified Rodriguez as the

5   suspect he had been chasing.  *Id.* ¶ 26; Doc. 24-1 ("Pl.'s Resp. Def.'s Facts") ¶ 1.  Glenn then

6   swept through Rodriguez's hotel room, Stmt. Mat. Facts ¶ 27, and saw clothes and shoes that

7   seemed to match the clothes and shoes the suspect had been wearing, leading Glenn to believe

8   that Rodriguez had changed clothes before coming to the door, Pl.'s Resp. Def.'s Facts ¶ 2.

9        Rodriguez's version of the pursuit, which is based almost entirely on officer Glenn's body

10   camera footage, is as follows:  Once Schleicher lost sight of the suspect as he fled down the

11   embankment, Glenn heard the call on the radio but could not clearly see or identify the suspect.

12   *See* Opp'n at 3–4.  Glenn was driving along a street on the opposite side of the Roadrunner Inn

13   parking lot from the embankment.  *See* Doc. 24-3, Ex. B at 127; BWC Video at 0:00–0:24.  He

14   parked his car on the street outside the Roadrunner Inn, about 150 feet away from the entrance,

15   and began running toward the entrance to the stairwell.  *See* Opp'n at 3–4; BWC Video at 0:00–

16   0:24.  However, he never got a clear look at the suspect and never actually saw the suspect enter

17   the building or the stairwell because his view was obscured by the pillars that surround the

18   stairwell's entrance.  *Id.*; *see* BWC Video at 0:00–0:24; Doc. 24-3, Ex. B at 127.  He never saw

19   the suspect on the second or third floor, either.  Pl.'s Resp. Def.'s Facts ¶ 12.  Glenn was the only

20   officer who claimed to have seen the suspect enter the hotel.  *Id.* ¶ 14; Doc. 24-3, Ex. A ("Glenn

21   Dep.") at 68:5–7.[2]

22        Once Glenn reached the third floor, he announced himself and scanned the hallway but

23   did not see anyone.  *Id.* at 0:33–0:47.  The window at the end of the hotel hallway was open, and

24   Glenn looked out the window but did not see the suspect.  *Id.* at 00:35–00:45.  Another officer

25   arrived on the third floor and they both began to walk the other way down the hallway.  *Id.* at

26   0:47–1:15.  Glenn trailed behind that officer until they met up with three other officers at the

27

28   [2]  Glenn's body camera never captured the suspect, and the audio did not begin recording until Glenn activated it as he ascended the stairs.  BWC Video at 0:00–0:30.

1   opposite end of the hallway.  *Id.*  Defendant officers Alexander and Schleicher were not among

2   them.  *See id.*  The officers shouted to each other and spoke in raised voices.  *See id.*

3          As two of the officers began to descend the stairs to the second floor to search for the

4   suspect there, Rodriguez opened his hotel room door to see what was happening in the hallway.

5   *Id.* at 1:18–1:35.  He was wearing a black tank top and jeans, and unlike Glenn, was not out of

6   breath or sweating.  *Id.*  After the officers turned and stared at Rodriguez for about five seconds,

7   Glenn said, "That's him."  *Id.* at 1:31–1:47.  The other two officers grabbed and handcuffed

8   Rodriguez as Glenn entered Rodriguez's hotel room and began to look through it.  *Id.* at 1:45–

9   2:34.  Rodriguez immediately asked, "What did I do?," *id.*, and once the officers explained that

10  they believed he was the suspect they had chased, he repeatedly asserted, "I did not run from

11  [anyone]."  *Id.*

12         From this point on, the parties' facts are relatively undisputed.  *See generally* Pl.'s Resp.

13  Def.'s Facts.  After looking around in Rodriguez's hotel room, Glenn proceeded downstairs to

14  check the hotel's security camera footage.  Stmt. Mat. Facts ¶ 29–30.  During his walk down the

15  stairs and in the hotel management office, Glenn and other officers repeatedly expressed doubts

16  about whether Rodriguez was in fact the suspect they had been chasing.  *Id.* ¶¶ 30–35.  In fact, as

17  soon as the other officers came into the hotel management office – before they watched the

18  security camera footage – Glenn said, "That may not be him."  *Id.* at 5:32–5:38.  However, he

19  immediately followed that statement by telling the other officers that, when Rodriguez opened the

20  door, he was out of breath and the clothes on the floor in the hotel room matched the suspect's

21  clothes.[3]  BWC Video at 3:15–3:19, 5:45–5:52.

22  ///

23  ///

24  _____

25  [3]  Glenn told the other officers, including defendant officers Alexander and Schleicher, that
    Rodriguez was out of breath when he came to the door.  BWC Video at 3:15–3:19, 5:45–5:52.

26  However, on the body camera footage Rodriguez does not appear out of breath or sweating when
    he opens the hotel room door.  *Id.* at 1:31–1:45. On a motion for summary judgment, when events

27  such as these are captured on video, the Court must "view[] the facts in the light depicted by the
    videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007).

28

The hotel manager played the security camera footage, a grainy video that showed, very briefly, the suspect run past the camera and into the stairwell.[4]  *Id.* at 5:45–13:00.  Defendant officers Schleicher and Alexander were also present in the hotel management office.  Stmt. Mat. Facts ¶ 30.  The officers were unsure, as they watched, whether the hair, facial hair, clothing, and tattoos of the suspect in the video matched those of Rodriguez.  *Id.* ¶¶ 31–35.  Alexander recorded the split-second clip of the suspect running by the camera on his phone so that the officers could do a freeze-frame analysis.  *Id.* ¶ 36.  The officers then proceeded to the parking lot to watch the video on Alexander's phone.  BWC Video at 13:20–14:00.

As they watched the video, some officers continued to question whether Rodriguez was the suspect, and at one point, they let him out of handcuffs.  *Id.* at 14:00–17:52.  However, Sergeant McWilliams noticed that the suspect in the video was wearing Vans shoes, which have a distinctive white stripe, and there were also a pair of Vans shoes in Rodriguez's hotel room.  *Id.* at 16:31–16:45.  McWilliams stated that Rodriguez was the suspect, and no other officer raised additional questions at that point.  *Id.* at 16:45–17:32.

Schleicher submitted the following probable cause statement about an hour after the arrest:

> I attempted to conduct a traffic enforcement stop of a vehicle which OSVALDO RODRIGUEZ was the driver and single occupant. RODRIGUEZ failed to yield to my overhead red and blue lights and siren and lead myself and other officers on a vehicle pursuit. During the vehicle pursuit RODRIGUEZ failed to stop at red traffic signal lights, was driving at 95 MPH on city streets, and drove in the wrong direction of travel two different times during the vehicle pursuit. RODRIGUEZ was driving recklessly and with w[a]nton disregard to

---

[4]  The hotel security camera footage is filed at Doc. 22-5, Ex. 5.  The video is grainy, and the suspect's features, such as hairstyle, clothing, and tattoos, are difficult to discern.  In the video, all that can clearly be seen is that the suspect is shirtless, wearing black shorts, and has short hair – although the exact hairstyle is not clear.  *See id.* at 0:03.  For a moment, when the suspect can be seen through the hotel management office's glass doorway, there is shading that could be a tattoo or a shadow.  *Id.*  A moment later, when the suspect can be seen through the window, there does not appear to be shading on his left shoulder.  *Id.*  Rodriguez has tattoos on his left and right arms, but it is unclear from any of the videos whether Rodriguez has a tattoo on his left shoulder.  *See* BWC Video at 01:32–01:35, 02:47–02:43.  While reviewing the surveillance video, several officers suggest that the suspect and Rodriguez both have some sort of marking on the left shoulder.  *See id.* at 17:30–17:35 ("Yes, on the back side of his shoulder right there. That's him.").

1
2
3
4
5

> the public. RODRIGUEZ disabled his vehicle and fled on foot from officers, further delaying our investigation. Officers located and detained RODRIGUEZ inside a nearby hotel, Officers conducted a search of RODRIGUEZ'S vehicle and located Saw blades. From my training and experience I know that saw blades are commonly used to steal catalytic converters off of vehicles. A records check of RODRIGUEZ revealed an active misdemeanor warrant for his arrest (BM95S9SSA) for violation of PC 647(f) and H&S 11364.

6   Stmt. Mat. Facts ¶ 37.

7           On September 14, 2021, a judge of the Kern County Superior Court determined that the

8   officers had probable cause to arrest Rodriguez for each of the crimes except auto theft, based on

9   the probable cause statement.  Pl.'s Resp. Def.'s Facts ¶¶ 5–6; Doc. 22-5, Ex. 6; Doc. 22-5, Ex. 7.

10  On September 15, 2021, the judge made an additional determination that there was probable

11  cause to arrest Rodriguez for auto theft, as well, based on a separate probable cause statement that

12  added facts about the stolen Tahoe.  Pl.'s Resp. Def.'s Facts ¶¶ 5–6; Doc. 22-5, Ex. 7.  On

13  September 16, 2021, the Kern County District Attorney's Office charged Rodriguez with

14  violations of California Vehicle Code §§ 2800.2, 10851, and 14601.1 and California Penal Code

15  §§ 466 and 148(a)(1).  *Id.* ¶¶ 43, 44.

16          On October 4, 2021, a preliminary hearing was held, and another judge of the Kern

17  County Superior Court determined that there was probable cause to require Rodriguez to stand

18  trial based on the testimony of Glenn and Schleicher.  Stmt. Mat. Facts ¶¶ 45–51; Doc. 22-5, Ex.

19  9 at 115:14–115:25.  Glenn testified that he saw Rodriguez run into the hotel, chased him inside,

20  and identified him as the person who had run from him once Rodriguez opened the hotel room

21  door.  MSJ at 5.  Schleicher testified about the vehicle chase and identified Rodriguez as the

22  driver of the Tahoe.  *Id.*  Neither officer testified that they were initially doubtful that Rodriguez

23  was the suspect, that they searched his hotel room, that they reviewed the hotel security camera

24  footage, that the hotel security camera footage showed the suspect was wearing Vans, that there

25  were a pair of Vans in Rodriguez's hotel room, or that Rodriguez was or was not out of breath or

26  sweating when he opened the door.  *Id.* at 5–6; *see* Doc. 22-5, Ex. 9 ("Preliminary Hearing

27  Transcript").  Glenn's body camera footage and the hotel security camera footage were also not

28  presented at the hearing.  *See* Doc. 25-2, Ex. D ("Public Defender Decl.") ¶¶ 6–10.

1    Rodriguez was jailed for 143 days.  MSJ at 8; Opp'n at 2.  There is no evidence in the

2    record before the Court tying Rodriguez to the stolen, crashed Chevrolet Tahoe.  The officers

3    eventually conducted a search of the GPS data on Rodriguez's cell phone and apparently

4    concluded that he had been in his hotel room all night during the incident, up to the moment of

5    his arrest.  *Id.*  At that point, all charges were dismissed, and Rodriguez was released from

6    custody.  *Id.*

7          On August 28, 2023, Rodriguez filed suit in this Court.  *See* Doc. 1.  He asserts a claim

8    under 42 U.S.C. § 1983 for unlawful arrest against the individual officers and a claim for *Monell*

9    liability against the City of Bakersfield ("City").  FAC ¶¶ 32–43.  On October 28, 2024,

10   defendants moved for summary judgment on all claims.  *See* MSJ.  On November 12, 2024,

11   Rodriguez filed an opposition, Doc. 24 ("Opp'n"), and two days later, filed an additional

12   declaration and exhibits, Doc. 25.[5]  Defendants filed a reply.  Doc. 26.  The Court held a hearing

13   _____

14   [5]      Rodriguez's opposition was untimely.  His opposition and supplement to the opposition
     were filed fifteen and sixteen days after the motion was filed, respectively.  *See* Docs. 24, 25.
15   Local Rule 230(c) requires an opposition to be filed fourteen days after the filing of a motion for
     summary judgment.
16          The opposition filings were also deficient in several respects.  First, Local Rule 260(b)
     provides that "[a]ny party opposing a motion for summary judgment or summary adjudication
17   shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that
     are undisputed and deny those that are disputed, including with each denial a citation to the
18   particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or
     other document relied upon in support of that denial."  Rodriguez did not file a response to the
19   defendants' "Statement of Undisputed Facts – Joint," Doc. 22-2.  *See* Docs. 24, 25.  However,
     Rodriguez clearly does oppose many of the facts contained therein.  For example, defendants
20   proffer that "Officer Glenn saw the suspect run into the Roadrunner motel."  Doc. 22-2 ¶ 18.  In
     contrast, Rodriguez's opposition argues that "Officer Glenn did not actually see the suspect run
21   into the motel."  Doc. 24 at 3.  However, this contention is nowhere reflected in a side-by-side
     response to the "Statement of Undisputed Facts – Joint" ¶ 18.  The Court therefore must piece the
22   facts together using multiple filings, which would not be the case if Rodriguez's counsel had
     complied with Local Rule 260(b).  Second, the opposition does not meaningfully respond to the
23   legal arguments contained in defendants' motion for summary judgment.  *Compare* MSJ at 17–30
     (arguing that defendants are entitled to summary judgment on various Fourth Amendment claims,
24   such as false arrest) *with* Opp'n at 5–8.  Instead, the opposition makes arguments about a *Brady*
25   claim which is not mentioned in the pleadings.  *See generally* FAC.
26          Considering the lack of excuse for the untimely filing and the other deficiencies noted
     above, the Court would be justified in construing the untimely filing as a non-opposition.  *See*
27   Local Rule 203(c).  However, the Court will exercise its discretion and considers the opposition
     on the merits.
28

                                              7

1    on December 2, 2024, and the motion was argued and submitted.  Doc. 27.

2    **II.    <u>Legal Standard</u>**

3    Summary judgment is appropriate if "there is no genuine dispute as to any material fact

4    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

5    "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

6    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

7    of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in

8    the record."  Fed. R. Civ. P. 56(c)(1).  The Court then views the record in the light most favorable

9    to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

10   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  However, the nonmoving party's

11   version of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v.*

12   *City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary

13   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

14   genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

15   "A party seeking summary judgment bears the initial burden of informing the court of the

16   basis for its motion and of identifying those portions of the pleadings and discovery responses

17   that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless,*

18   *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

19   (1986)).  If "the moving party will have the burden of proof on an issue at trial, the movant must

20   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

21   party."  *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he

22   moving defendant bears the burden of proof on the issue of qualified immunity.").

23   If the moving party meets its initial burden, the burden shifts to the nonmoving party to

24   produce evidence supporting its claims or defenses and "establish that there is a genuine issue of

25   material fact."  *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply

26   show that there is some metaphysical doubt as to the material facts."  *Id.* at 586 (citation omitted).

27   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

28   insufficient to survive summary judgment.  *Anderson*, 477 U.S. at 252.

1    In the endeavor to establish the existence of a factual dispute, the nonmoving party need

2    not establish a material issue of fact conclusively in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

3    *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual

4    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

5    trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

6    253, 289 (1968)).  However, "[w]hen opposing parties tell two different stories, one of which is

7    blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

8    adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*

9    *v. Harris*, 550 U.S. 372, 380.  Nevertheless, "[t]he mere existence of video footage of the incident

10   does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn

11   from that footage." *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

12   "If the nonmoving party fails to produce enough evidence to create a genuine issue of

13   material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

14   party produces enough evidence to create a genuine issue of material fact, the nonmoving party

15   defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

16   1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

17   **III.**   **Discussion and Analysis**

18   Rodriguez asserts that the individual officers deprived him of his Fourth Amendment

19   rights by arresting him without probable cause and that the City is subject to *Monell* liability for

20   failure to train the officers.  FAC ¶¶ 33, 38–43.  The officers move for summary judgment on the

21   unlawful arrest claim, arguing first that Rodriguez is collaterally estopped from pressing the issue,

22   and even if he is not, they are entitled qualified immunity.  MSJ at 17–27.  The City argues that

23   there was no underlying constitutional violation by the officers, and even assuming there was, *Id.*

24   Rodriguez has presented no evidence of similar constitutional violations to support his claim.  *Id.*

25   at 27–32.  Before turning to the merits of these arguments, however, the Court addresses

26   evidentiary objections raised by defendants.

27   **a.  Evidentiary Objections**

28   Federal Rule of Civil Procedure 56(c)(2) allows a party to "object that the material cited to

1  support or dispute a fact cannot be presented in a form that would be admissible in evidence."

2  Fed. R. Civ. P. 56(c)(2).  Defendants contend that Rodriguez fails to point to any evidence to

3  support his version of many of the facts he calls into dispute and that his disputes as to those facts

4  call for speculation and conjecture.  *See* Doc. 26-2 ¶¶ 1–3, 10–12, 14–15.  Defendants also object

5  that another set of facts which he intends to call into dispute are irrelevant.  *Id.* ¶¶ 16–19.

6  **i.    Defendant's Objections: Speculative Facts**

7      "To survive summary judgment, a plaintiff must set forth non-speculative evidence of

8  specific facts, not sweeping conclusory allegations."  *Cafasso, United States ex rel. v. General*

9  *Dynamics C4 Systems Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).  Evidence adduced by the non-

10  moving party to establish a genuine dispute of material fact is insufficient if it "establishes only

11  that this set of events could conceivably have occurred; it [must instead] give rise to a reasonable

12  inference that it did in fact occur."  *Id.*  Additionally, when events such as these are captured on

13  video, the Court need not view the facts in the light most favorable to the nonmoving party; it

14  "should [] view[] the facts in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372,

15  381 (2007).  Nevertheless, "[t]he mere existence of video footage of the incident does not

16  foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that

17  footage."  *Vos*, 892 F.3d at 1028 (citing *Scott*, 550 U.S. at 380).

18      Defendants object that the following facts asserted by Rodriguez are unsupported by the

19  evidence and speculative: (1) officer Glenn did not "immediately identify" Rodriguez as the

20  suspect when he emerged from the hotel room, Doc. 26-2 ¶ 1; (2) Glenn did not actually see the

21  suspect run into the hotel, *id.* ¶¶ 11–12; (3) Glenn did not get a clear look at the suspect, *id.*,

22  Opp'n at 3; (4) Glenn was the only officer who claimed to have seen the suspect run into the

23  hotel, *id.* ¶ 14; (5) other officers agreed that Rodriguez was not the suspect, *id.* ¶ 15; (6) the Vans

24  shoes found in the hotel room were not covered in dirt, debris, weeds, or grass as one would

25  expect if Rodriguez had fled down the embankment, *id.* ¶¶ 2–3; and (7) Glenn was unable at the

26  preliminary hearing to identify Rodriguez as the suspect he had chased, *id.* ¶ 10.  The Court

27  examines each in turn.

28      First, Glenn's body camera footage shows that he did identify Rodriguez as the suspect he

had been chasing almost immediately when Rodriguez opened his door. BWC Video at 1:26–1:31. There was a brief pause of five seconds between the moment when Rodriguez opened his door and the moment when Glenn said, "That's him." *See* Doc. 26-2 ¶ 1. This fact is clearly captured by the video footage, and the Court will view this fact in the light the depicted by the video. *See Scott*, 550 U.S. at 380.

Second, Rodriguez fails to create a genuine dispute of fact as to whether Glenn saw the suspect run into the hotel. Rodriguez is correct that Glenn's body camera never captured the suspect. BWC Video at 0:16–0:33. However, prior to running toward the entrance, Glenn was driving along the road beside the parking lot, and he would have had a relatively clear view of the parking lot. *Id.* at 0:00–0:16. His body camera failed to capture the events taking place in the parking lot because it was attached to his chest and positioned too low to capture the events happening outside of the driver's side window. *See id.* Also, because it was attached to Glenn's chest while he was driving, the camera was presumably facing forward. While the camera captured only the interior of the police car at that point, Glenn would have been able to see the fleeing suspect from his car window. Moreover, the suspect did in fact run from the parking lot into the hotel at that time, as reflected on the hotel's security camera footage, *see* Doc. 22-5, Ex. 5 ("Hotel Security Camera Footage") at 0:00–0:05. Glenn testified that he saw the suspect run into the hotel. *See* Glenn Dep. at 68:5–68:7. The fact that Glenn's body camera did not capture the suspect running into the hotel, due to the position of the camera when Glenn was in the police car, does not create a genuine dispute of fact as to whether Glenn saw the suspect.

Third, Rodriguez also contends that, even if Glenn could see the suspect running through the parking lot and into the stairwell, Glenn could not see the suspect clearly enough to establish probable cause to arrest Rodriguez. *See* Doc. 26-2 ¶ 11–12; Opp'n at 3. Rodriguez argues that a reasonable factfinder could draw the inference that Glenn did not get a sufficiently clear look at the fleeing suspect in the parking lot. *See* Opp'n at 3–4. Specifically, Rodriguez points to the following circumstantial evidence contained in the record: the body camera footage never captured the suspect, *see* BWC Video at 0:00–0:31; Glenn was unsure after the initial arrest whether Rodriguez was the person he had been chasing and stated multiple times, "That may not

be him," *see id.* at 5:32–5:38, 11:12–11:14, Stmt. Mat. Facts ¶¶ 31–35; Glenn could not recall the hairstyle or clothing of the suspect he had been chasing, *see* BWC Video at 12:45–13:08, Preliminary Hearing Transcript at 95:7–20; until the preliminary hearing, Glenn never identified any specific features of the suspect that he was able to observe during the chase that led him to believe Rodriguez was the suspect, such as facial features, height, build, etc., *see* BWC Video at 01:18–17:52, and at the preliminary hearing, he was inconsistent and made conflicting statements about what features he had purportedly observed,[6] *see* Preliminary Hearing Transcript at 91:5– 95:20; Glenn was parked over 150 feet away from the stairwell, *see* BWC Video at 0:16–0:31, Preliminary Hearing Transcript at 94:12–14; and Glenn's view of the suspect was obscured by the vehicles in the parking lot, the pillars that surrounded the stairwell, and the fact that it was dark outside, *see* BWC Video at 0:00–0:30, Doc. 24-3, Ex. B at 127–30.

Rodriguez's proffered inference is that, even if Glenn did see the suspect running away from him in the parking lot, Glenn did not get a clear enough look at the suspect to identify him. Some features of the suspect, like approximate height and build, may have been observable in the parking lot from 150 feet away at night.  Other features were not as observable at night from a vehicle 150 feet from the fleeing suspect.  For example, Glenn could not later recall the suspect's hairstyle or clothing.  *See* BWC Video at 12:45–13:08, Preliminary Hearing Transcript at 95:7– 20.

Glenn does not specifically respond to the points made in this argument, and instead, he generally contends that he had a sufficiently clear look at the suspect while the suspect was running into the hotel and that he then identified Rodriguez as the suspect at the hotel room doorway.  *See* Stmt. Mat. Facts ¶¶ 18–24; Doc. 26-2 ¶ 3.  As the moving party, defendants have the burden to point to the specific facts supporting summary judgment, and it is noteworthy that

---

[6]  During direct examination, Glenn stated once that he saw the suspect wearing "tan pants or tan shorts. He had a sleeveless shirt. I could see his tattoos."  Preliminary Hearing Transcript at 91:5– 6.  During cross-examination, however, he stated that he could not recall what the suspect was wearing as he ran through the parking lot or what Rodriguez was wearing when he came to the door.  *Id.* at 95:7–20.

1    defendants do not point to the specific features of the suspect that Glenn was able to observe.

2         On a motion for summary judgment, the Court's function "is not 'to weigh the evidence

3    and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"

4    *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249).  The question is

5    whether a reasonable jury could draw the inference that Glenn did not get a sufficiently clear look

6    at the suspect in the parking lot.  *Matsushita*, 475 U.S. at 588.  If Glenn did not get a clear look at

7    the suspect running into the hotel, then his identification of Rodriguez at the hotel room door is

8    entitled to little or no weight in the probable cause analysis.  This is a close call, but the Court

9    concludes that there is a genuine dispute of fact as to whether Glenn got a sufficiently clear look

10   because the circumstantial evidence, taken together, supports a reasonable inference that Glenn

11   did not get a clear look at the suspect from 150 feet away, at night, as the suspect ran into the

12   hotel entrance.

13        Fourth, Glenn was the only officer who claimed to have seen the suspect run into the

14   hotel.  Glenn Dep. at 68:5–68:7.  Defendants argue that "the evidence cited does not support the

15   fact stated," Doc. 26-2 ¶ 14, but their position is clearly contradicted by the record.  The evidence

16   does support the fact stated, and defendants fail to meaningfully rebut this point.

17        Fifth, Rodriguez asserts that "[o]ther officers agreed that [Rodriguez] was not the

18   suspect."  Doc. 62-2 ¶ 15.  In support of this statement, he points to Glenn's deposition, where

19   Glenn testified that, at one point, Alexander and another officer stated, "This is not our guy.  He

20   doesn't have the tattoos.  He was clean-shaven."  Glenn Dep. at 71:17–71:24.  Similar statements

21   can also be heard on Glenn's body camera footage.  *See* BWC Video at 13:00–13:08.  This

22   evidence shows that, while reviewing the hotel security footage, Glenn and the other officers

23   were unsure whether Rodriguez was the suspect.  *See id.*  However, Rodriguez's statement that

24   "[o]ther officers agreed that [Rodriguez] was not the suspect," Doc. 62-2 ¶ 15, is misleading, and

25   the Court will view the facts in the light depicted by the videotape.  The body camera video

26   reflects that when the officers were reviewing the hotel security camera footage, they expressed

27   uncertainty at times as to whether Rodriguez was the fleeing suspect.

28        Sixth, the Vans shoes found in the hotel room were not covered in dirt or debris.  *See* Doc.

13

24-3, Ex. C at 132–33; BWC Video at 19:00–19:06.  Rodriguez includes a photo of the embankment that the suspect ran down.  Doc. 24-3, Ex. B at 127.  Based on the undisputed evidence, a reasonable jury could draw the inference that if Rodriguez had just run down that embankment, his shoes would have had dirt and debris on them.

Seventh, Rodriguez contends that Glenn did not identify him as the suspect at the preliminary hearing.  Doc. 26-2 ¶ 10.  This is plainly unsupported by the evidence.  The judge presiding over the preliminary hearing allowed Glenn to identify the suspect, and Glenn did so by pointing to Rodriguez.  *See* Doc. 22-5, Ex. 9 at 91:7–91:25.

### ii.    Defendants' Objections: Irrelevant Facts

Defendants contend that the following facts are irrelevant: (1) the sergeant noticed that the suspect was wearing Vans shoes in the video, Doc. 26-2 ¶ 16; (2) the Vans shoes found in the room had no shoelaces and were clean, *id.* ¶ 17; (3) the allegation that the suspect was not wearing Vans shoes was not in Glenn's report, *id.* ¶ 18; and (4) Glenn did not indicate in his report that he and other officers doubted, on several occasions, that Rodriguez was the suspect, *id.* ¶ 19.

Contrary to defendants' position, however, each of these assertions is relevant because defendants argue that Rodriguez is collaterally estopped from raising his unlawful arrest claim in this case because prior courts found that there was probable cause to arrest him and probable cause to hold him for trial.  MSJ at 17–21.  Each of these facts is relevant to the Court's discussion below as to whether collateral estoppel is inapplicable because the facts presented to those courts were different than the facts presented here.

With these evidentiary objections addressed, the Court proceeds to the discussion of the claims.

### b.  Collateral Estoppel

The first question is whether the doctrine of issue preclusion bars Rodriguez's claims.  The state court found that there was probable cause to arrest Rodriguez for the offenses with which he was charged and that there was probable cause to make him stand trial on those charges.  Doc. 22-5, Ex. 6; Doc. 22-5, Ex. 9 at 115:14–115:25.  If those findings are afforded preclusive

1    effect, then Rodriguez's claims are barred because each hinges on his contention that the officers

2    did not have probable cause to search or arrest him.  "Probable cause to arrest exists when

3    officers have knowledge or reasonably trustworthy information sufficient to lead a person of

4    reasonable caution to believe that an offense has been or is being committed by the person being

5    arrested," and it is an assessment that is based on the totality of circumstances.  *United States v.*

6    *Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

7         The Court must give preclusive effect to the "state-court judgments [if] the courts of the

8    State from which the judgment[s] emerged would do so."  *Wige v. City of Los Angeles*, 713 F.3d

9    1183, 1185 (9th Cir. 2013) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)); *see Haupt v.*

10   *Dillard*, 17 F.3d 285, 288 (9th Cir. 1990).  California courts abide by the doctrine of issue

11   preclusion when "(1) the issue sought to be relitigated [is] identical to the issue decided in the

12   earlier action; (2) the issue [was] actually litigated and (3) necessarily decided in the earlier

13   action; (4) the earlier decision [was] final and made on the merits; and (5) the party against whom

14   issue preclusion is asserted [was] a party to the earlier action or in privity with such a party."  *Id.*

15   (citing *Lucido v. Superior Court*, 272 Cal. Rptr. 767, 795 (Cal. 1990)).  In most cases, "each of

16   these requirements will be met when courts are asked to give preclusive effect to preliminary

17   hearing probable cause findings in subsequent civil actions for false arrest . . . ."  *See id.*

18        The identity-of-issues requirement is ordinarily satisfied in such a case because the

19   question presented at both the preliminary hearing and later unlawful arrest action is whether the

20   evidence established that the officers had probable cause to arrest.  *See id.*  The test used to assess

21   whether the officers could perform a warrantless arrest is the same as the test for whether there is

22   enough evidence to require a criminal defendant to stand trial.  *Id.* (citing *McCutchen v. City of*

23   *Montclair,* 87 Cal. Rptr. 2d 95, 99–101 (Cal. 1999)).  "The test in both instances is whether the

24   available evidence would lead a reasonable person to harbor a strong suspicion of the accused's

25   guilt."  *Id.* (citing *People v. Campa*, 206 Cal. Rptr. 114 (Cal. 1984) (arrest); *People v. Uhlemann,*

26   108 Cal. Rptr. 657 (Cal. 1973) (preliminary hearing)).  Therefore, "so long as the evidence known

27   to the arresting officers is not materially different from the evidence presented at the preliminary

28   hearing, 'a finding of sufficiency of the evidence to require the defendant to stand trial is a

15

1    finding of probable cause to arrest the defendant.'" *Id.* (quoting *McCutchen,* 87 Cal. Rptr. 2d at

2    100).

3         However, the identity-of-issues requirement is not met if the available evidence in the

4    subsequent action is materially different from the evidence presented at the preliminary hearing.

5    *Id.* at 1186.  California courts recognize two general exceptions to the identity-of-issues

6    requirement.  *Id.*  The first exception to the identity-of-issues requirement applies "when

7    additional evidence not available to the officers at the time of arrest is presented at the

8    preliminary hearing."  *Id.* (citing *McCutchen,* 87 Cal. Rptr. 2d at 100).  The second exception

9    applies when "the plaintiff alleges that the arresting officer lied or fabricated evidence presented

10   at the preliminary hearing."  *Id.*  "That the court found probable cause based on the set of facts

11   presented at the preliminary hearing obviously does not resolve whether the officers had probable

12   cause based on the true set of facts known to them."  *Id.*  Additionally, "cases involving

13   intentional concealment of exculpatory evidence" fall within this second exception, and plaintiffs

14   may re-litigate the issue of probable cause "with the undisclosed evidence added back into the

15   equation."  *Id.* (citing *Morley v. Walker*, 175 F.3d 756, 760 (9th Cir. 1999).

16        Here, key evidence available to the officers at the time of arrest was not presented at the

17   probable cause hearing and was not disclosed to Rodriguez's public defender.  Public Defender

18   Decl. ¶¶ 6–10.  Rodriguez's public defender was not provided with either the body camera

19   footage or the hotel security camera footage, *id.*, and both videos would have furnished counsel

20   with significant additional evidence bearing on the question of probable cause, including arguably

21   exculpatory statements by Glenn, such as, "That may not be him."  BWC Video at 5:32–5:38.

22        Glenn's testimony at the preliminary hearing largely mirrored his probable cause

23   statement.  *Compare* Stmt. Mat. Facts ¶ 30 *with* Preliminary Hearing Transcript at 88:26–95:28.

24   Both Schleicher and Glenn were asked to identify the suspect they chased, and both identified

25   Rodriguez.  Stmt. Mat. Facts ¶ 49; Preliminary Hearing Transcript at 91:2–28.  However, there

26   was additional, undisclosed evidence available to the officers at the time of arrest which could

27   arguably negate a finding of probable cause.  *See* Public Defender Decl. ¶¶ 6–10.  For example,

28   Rodriguez was not sweating or out of breath when he came to the door, *see* BWC Video at 1:18–

16

1   1:35; after his initial identification at the hotel room door, Glenn expressed uncertainty multiple

2   times as to whether Rodriguez was the suspect, *e.g.*, *id.* at 5:38–5:45; Schleicher did not identify

3   Rodriguez as the suspect on the night of the arrest; and the Vans shoes found in the room did not

4   have dirt or debris on them as would be expected if Rodriguez had just run down an embankment,

5   *id.* at 19:00–19:06, Doc. 24-3, Ex. C at 132–134.  As such, the identity-of-issues requirement is

6   not met and issue preclusion does not apply.  Rodriguez is entitled to relitigate the issue of

7   whether there was probable cause to arrest him.

8       **c.   Unlawful Arrest**

9          Having found that issue preclusion does not apply, the Court turns to the merits of

10  Rodriguez's § 1983 claim for unlawful arrest.[7]  In response to this claim, the officers argue that

11  they are entitled to qualified immunity.

12         Qualified immunity shields "government officials 'from liability for civil damages insofar

13  as their conduct does not violate clearly established statutory or constitutional rights of which a

14  reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting

15  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "balances two important interests

16  – the need to hold public officials accountable when they exercise power irresponsibly and the

17  need to shield officials from harassment, distraction, and liability when they perform their duties

18  reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the

19  officer's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of

20  law and fact.'"  *Id.* (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)).  An officer may be

21  denied qualified immunity only if "(1) the [evidence], taken in the light most favorable to the

22  party asserting injury, show[s] that the officer's conduct violated a constitutional right, and (2) the

---

[7]  The officers also move for summary judgment on other claims, to the extent that Rodriguez has
made any such other claims.  Specifically, they argue that they are entitled to summary judgment
on a *Deveraux* claim, an Equal Protection claim, and a conspiracy claim.  MSJ at 22–23, 24, 25.
None of these claims appear in the complaint, apart from a single reference to racial
discrimination in a single paragraph in the "facts" section.  *See* FAC ¶¶ 22, 32–37.  The single
cause of action leveled against the officers asserts only that Rodriguez's "right to be free from
unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendment" was
violated.  *Id.* ¶ 33.  There is therefore no Equal Protection, *Deveraux*, or conspiracy claim alleged
in the complaint.

1  right at issue was clearly established at the time of the incident such that a reasonable officer

2  would have understood her conduct to be unlawful in that situation." *Calonge v. City of San Jose*,

3  104 F.4th 39, 44 (9th Cir. 2024) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir.

4  2011)).  Courts are "permitted to exercise their sound discretion in deciding which of the two

5  prongs of the qualified immunity analysis should be addressed first in light of the circumstances

6  in the particular case at hand."  *Pearson*, 555 U.S. at 236.  The Court now turns to examine the

7  actions of each defendant officer.

8  **1.  Officer Steven Glenn**

9  **a.  Constitutional Violation**

10  The Court elects to begin with the first prong of the qualified immunity analysis, whether

11  Glenn's conduct during the arrest violated Rodriguez's Fourth Amendment rights.  "A claim for

12  unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the

13  arrest was without probable cause or other justification."  *Dubner v. City & Cnty. of San*

14  *Francisco*, 266 F.3d 959, 965 (9th Cir. 2001); *see Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071,

15  1076 (9th Cir. 2011) ("It is well established that an arrest without probable cause violates the

16  Fourth Amendment and gives rise to a claim for damages under § 1983.").  An officer may

17  perform a warrantless arrest without violating the "Fourth Amendment [so long as] there is

18  probable cause to believe that a crime has been or is being committed."  *Devenpeck v. Alford*, 543

19  U.S. 146, 152 (2004).

20  Defendants argue that the officers had probable cause because (1) "Officer Glenn saw the

21  suspect enter the hotel as he was chasing him"; (2) "Glenn immediately identified [Rodriguez] as

22  the person he chased into the hotel"; (3) "after looking at the surveillance video, the officers

23  confirmed the person in the video matched [Rodriguez] and the clothes in [Rodriguez's] hotel

24  room matched the clothes worn by the person in the surveillance video"; and (4) Rodriguez "had

25  an active misdemeanor warrant for his arrest."  Reply at 2–3.

26  On a motion for summary judgment based on qualified immunity, the Court must view the

27  evidence in the light most favorable to Rodriguez and draw all reasonable inferences in his favor.

28  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88; *Calonge*, 104 F.4th at 44.  The Court must

therefore assume that Glenn did not get a clear look at the suspect in the parking lot.  Opp'n at 3.

Glenn's assessment that Rodriguez was the suspect when Rodriguez opened his hotel room door

was thus based on the following considerations: the suspect had last been seen running into the

hotel; Glenn believed he heard the suspect heading up to the third floor; the suspect had been

described by other officers as an adult Hispanic male wearing a black t-shirt and black shorts; and

it was late at night, at a time most people would presumably have been asleep, when Rodriguez

opened his room door; and Rodriguez was an adult Hispanic male wearing a black tank top and

jeans.  Stmt. Mat. Facts ¶ 14.

"Probable cause must be determined at the time the arrest is made, [and facts] learned or

evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless

they were known to the officer at the moment the arrest was made."  *Allen v. City of Portland*, 73

F.3d 232, 236 (9th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)).  A

court's examination of an unlawful arrest claim must focus on the time the arrest occurred and

determine whether there was probable cause at that moment, not whether probable cause arose

afterward.  *See id.*; *see also*, *e.g.*, *California v. Hodari D.*, 499 U.S. 621, 623–25 (1991) ("A

seizure is a single act, and not a continuous fact.").  The analysis must therefore determine, first,

at what moment Rodriguez was arrested within the meaning of the Fourth Amendment, and

second, whether the officers had probable cause at that moment.

### i.  Moment of Arrest

There are two tiers of police seizures under the Fourth Amendment, *Terry* stops and full-

scale arrests.  *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020).  To perform a

*Terry* stop, police must possess "a reasonable suspicion supported by articulable facts that

criminal activity may be afoot."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  This

"reasonable suspicion" standard is a "less demanding standard than probable cause, [but still must

be supported by] a minimal level of objective justification for the stop."  *Illinois v. Wardlow*, 528

U.S. 119, 123 (2000).  A *Terry* stop "usually consume[s] less than a minute and involve[s] a brief

question or two," *Dunaway v. New York*, 442 U.S. 200, 210–11 (1979) (internal quotation marks

omitted), and must be "sufficiently brief and minimally intrusive," *United States v. Washington*,

1    387 F.3d 1060, 1069 (9th Cir. 2004).

2        A *Terry* stop may ripen into an arrest. *Id.* The Ninth Circuit has

3            described the test for determining when a *Terry*-stop becomes an
             arrest as whether the detention exceeded a brief stop, interrogation
4            and, under proper circumstances, a brief check for weapons. Then,
             if the stop proceeds beyond these limitations, an arrest occurs if,
5            under the circumstances, a reasonable person would conclude that he
             was not free to leave after brief questioning.
6

7    *Id.* (quotations omitted). "[D]istinguishing a *Terry* investigative stop from a de facto arrest 'may

8    in some instances create difficult line-drawing problems.'" *United States v. Ricardo D.*, 912 F.2d

9    337, 339–40 (9th Cir. 1990) (quoting *United States v. Sharpe,* 470 U.S. 675, 685 (1985)).

10   Nevertheless, "each case must be decided on its own facts." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1,

11   30 (1968)).

12       Importantly, Glenn's first contact with Rodriguez was made at his hotel room door, and

13   "[f]or Fourth Amendment purposes, a hotel room is treated essentially the same, if not exactly the

14   same, as a home." *United States v. Nerber*, 222 F.3d 597, 600 n.2 (9th Cir. 2013); *see also Stoner*

15   *v. California,* 376 U.S. 483, 490 (1964) ("No less than a tenant of a house . . . a guest in a hotel

16   room is entitled to constitutional protection against unreasonable searches and seizures."). The

17   Ninth Circuit has explained that while police may not conduct a *Terry* stop inside an individual's

18   home, *United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005), they may conduct a *Terry*

19   stop outside the entrance to an individual's home, *United States v. Crapser*, 472 F.3d 1141, 1149

20   (9th Cir. 2007). This is so because "[t]here is a critical difference . . . between the inside of a

21   home and the outer threshold and beyond." *Id.* One's "expectation of privacy" is undoubtedly

22   lower when they open their door and step beyond the threshold of the home. *Id.* Nevertheless,

23   the fact that the officers seized Rodriguez at his hotel room door is a factor to be considered in

24   deciding whether the seizure was a *Terry* stop or an arrest.

25       Another factor to consider is the officers' use of handcuffs. "Handcuffing as a means of

26   detaining an individual does not automatically escalate a stop into an arrest, but it 'substantially

27   aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a

28   typical *Terry* stop.'" *Reynaga Hernandez*, 969 F.3d at 937, 941 (9th Cir. 2020) (quoting *United*

1    *States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)).  Given that officers immediately grabbed

2    Rodriguez and placed him in handcuffs following Glenn's identification of him as the suspect, *see*

3    BWC Video at 01:31–01:45, 02:37–02:42, the intrusion was more than what one would expect in

4    a typical *Terry* stop.

5         Additionally, as soon as Glenn identified Rodriguez and the other two officers grabbed

6    him, Glenn skirted past Rodriguez and entered his hotel room, then proceeded to look around,

7    open the curtains, and look under clothing that was lying on Rodriguez's bed.  BWC Video at

8    1:45–2:34.  Other officers later entered and searched the room more thoroughly.  *See id* at 18:36–

9    24:57.  The parties do not address whether this constituted a lawful search under the Fourth

10   Amendment, and the Court need not decide that question for purposes of this motion.

11   Nevertheless, Glenn's warrantless and non-consensual entry into Rodriguez's hotel room as he

12   was being placed in handcuffs reflects the intrusiveness of the seizure.  *See Washington*, 387 F.3d

13   at 1069–70 (explaining that the officers' detention of the defendant at his hotel room door "was

14   more intrusive than necessary [and amounted to an arrest] because the officers' actions – in

15   particular, their repeated attempts to gain entry into [the defendant's hotel] room – were not

16   carefully tailored to the detention's underlying justification" – briefly questioning the defendant).

17        Lastly, nothing about this initial interaction resembled a typical *Terry* stop.  *See id.* at

18   1069 (explaining that a *Terry* stop consists of a "brief stop, interrogation and, under proper

19   circumstances, a brief check for weapons").  As far as can be seen from the available evidence,

20   the officers did not ask Rodriguez questions or ask for permission to search him.  Instead, Glenn

21   said, "That's him," and, in response, other officers grabbed and handcuffed Rodriguez.  BWC

22   Video at 1:45–1:55.  Accordingly, Rodriguez was arrested during this initial interaction.  The

23   pertinent question, therefore, is whether Glenn had probable cause to arrest Rodriguez at this

24   moment.

25                          **ii.  Probable Cause**

26        Viewing the facts in the light most favorable to Rodriguez, Glenn did not have probable

27   cause.  "Probable cause to arrest exists when [under the totality of circumstances,] officers have

28   knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution

                                          21

1   to believe that an offense has been . . . committed by the person being arrested." *United States v.*

2   *Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

3   Probable cause "is not a high bar: It requires only the 'kind of fair probability on which

4   reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 571 U.S.

5   320, 338 (2014) (quoting *Florida v. Harris,* 568 U.S. 237, 244 (2013)).  The test is not capable of

6   "precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Probable

7   cause "requires only a probability or substantial chance of criminal activity, not an actual showing

8   of such activity." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

9          Taking the evidence in the light most favorable to Rodriguez, as the Court must on this

10  motion, Glenn did not clearly see the suspect across the parking lot as he fled into the hotel.

11  Glenn could not identify any specific features of the suspect that he was able to observe while

12  chasing him.[8]  Therefore, at most, Glenn would have had the description of the suspect that had

13  been broadcast: an adult Hispanic male wearing a black t-shirt and black shorts.[9]  *See* Stmt. Mat.

14  Facts ¶ 14.  Glenn therefore made his assessment that Rodriguez was the suspect based on that

15  description.  When Rodriguez opened the door to his hotel room, however, he was wearing a tank

16  top and jeans, not a t-shirt and shorts.  BWC Video at 1:31–1:55.  That was less than a minute

17  after the suspect had been heard running up the stairs.  *Id.* at 0:29–1:26.  While Glenn is audibly

18  out of breath in the video, presumably from running up the stairs, Rodriguez is neither out of

19  breath nor visibly sweating.  *See id.* at 1:26–1:38.  Glenn's identification of Rodriguez as the

20  suspect at that moment is reduced to the fact that Rodriguez was an adult Hispanic male who

21  happened to be staying in the hotel on the floor to which Glenn believed the suspect had fled, and

---

22  [8]  Glenn states that his "gut feeling" was that Rodriguez was the suspect, but "[t]he Supreme

23  Court has made clear that 'hunches' are insufficient to establish reasonable suspicion, let alone
    probable cause." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (citing *Wardlow*,

24  528 U.S. at 123–24)).  Probable cause must be supported by "objective fact[s]."  *See id.*

25  [9]  In *United States v. Montero-Camargo*, the Ninth Circuit rejected the use of race or ethnicity as

26  a factor to be used in the reasonable suspicion analysis unless supported by other factors but
    clarified that "the use of factors such as dress or haircut [are appropriate] when they are relevant."

27  208 F.3d 1122, 1134 n.21 (9th Cir. 2000).  Here, however, Glenn did not know the suspect's
    haircut and Rodriguez was wearing jeans and a tank top, not a t-shirt and shorts, only a minute or

28  so after the suspect had run in the building.

1    that it was a time when most occupants would presumably be sleeping.

2    It is problematic to rely heavily on demographic characteristics such as ethnicity, gender,

3    and age to identify suspected criminals.  *United States v. Montero-Camargo*, 208 F.3d 1122, 1132

4    (9th Cir. 2000) (en banc) ("Hispanic appearance is not, in general, an appropriate factor to

5    consider [in establishing reasonable suspicion.]").  Moreover, the use of a characteristic such as

6    race is even more likely to be inappropriate when a large portion of the population in an area

7    shares that characteristic.  *See id.*  "Reasonable suspicion requires *particularized* suspicion, and in

8    an area in which a large number of people share a specific characteristic, that characteristic casts

9    too wide a net to play any part in a particularized reasonable suspicion determination."  *Id.*

10    (emphasis in original).  The population of Bakersfield is approximately 52.9% Hispanic or

11    Latino, 49.8% male, and 70.2% adult.  U.S. Census Bureau, Bakersfield, Cal. (2023),

12    https://www.census.gov/quickfacts/fact/table/bakersfieldcitycalifornia/PST045223.  There was

13    therefore a fair probability that a person stepping out of the hotel room that night would be an

14    adult Hispanic male, and these characteristics, standing alone, could not establish probable cause

15    to arrest Rodriguez.  *See Montero-Camargo*, 208 F.3d at 1134 n.21 (explaining that "a stop based

16    *solely* on the fact that the racial or ethnic appearance of an individual matches the racial or ethnic

17    description of a specific suspect [is] *not* [] justified," but "the use of racial or ethnic appearance as

18    *one* factor relevant to reasonable suspicion or probable cause when a particular suspect has been

19    identified as having a specific racial or ethnic appearance" may be appropriate).  Apart from these

20    characteristics, the other considerations supporting probable cause were:  Rodriguez was staying

21    in the hotel on the third floor, Glenn thought he heard the suspect run to the third floor, Glenn did

22    not see the suspect when he looked out the open hallway window; and it was late at night, when

23    most people would be asleep.

24    These considerations are insufficient to support a finding of probable cause.  Because

25    probable cause requires consideration of the totality of the circumstances, "[t]he effect of

26    evidence which may support, or incline toward, a finding of probable cause can . . . be vitiated by

27    countervailing evidence."  *Lopez*, 482 F.3d at 1074; *see United States v. Ortiz*, 427 F.3d 567, 574

28    (9th Cir. 2005) ("As a corollary . . . of the rule that the police may rely on the totality of facts

1    available to them in establishing probable cause, they also may not disregard facts tending to

2    dissipate probable cause." (quoting *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir. 1988)).

3         An examination of the circumstances shows that it was highly unlikely that Rodriguez was

4    the suspect:  Officers engaged in a high-speed freeway chase of a suspect; the suspect drove the

5    wrong way on Highway 99 into oncoming traffic for about three miles before losing control and

6    crashing into a traffic barrier in the highway median; and the suspect then ran from the scene of

7    the crash to a hotel several hundred feet away.  Stmt. Mat. Facts ¶¶ 1–35.  In contrast, Rodriguez

8    was a paying customer staying in a room at the hotel.  For Glenn to conclude that Rodriguez was

9    the suspect, he would have had to believe that a suspect fleeing from the police in a high-speed

10   freeway chase just so happened to lose control and crash into a traffic barrier on the highway only

11   hundreds of feet from a hotel where he had already booked a room and stored his belongings prior

12   to the chase.  While perhaps theoretically conceivable, such a Hollywood-like coincidence was

13   inherently unlikely.  Glenn's stated doubts that night as to whether they had the right guy (which

14   as noted above, were <u>not</u> provided to Rodriguez's public defender at the preliminary hearing)

15   perhaps reflect a recognition of the unlikeliness of his identification.

16        Moreover, Glenn could not have been certain that the suspect they were searching for was

17   still in the hotel.  When Glenn arrived on the third floor, and before he had any interaction with

18   Rodriguez, he noticed and looked out an open window at the end of the hallway, from which the

19   suspect may have escaped.  *Id.* at 0:47–1:15.  Additionally, Rodriguez was dressed differently

20   than the suspect despite only a minute or two having passed since the suspect ran into the hotel.

21   *See* BWC Video at 01:31–01:45.  Rodriguez was wearing a black tank top and jeans, while the

22   suspect had been described by Schleicher as wearing black shorts and a black t-shirt.  Stmt. Mat.

23   Facts ¶ 14.[10]

24        Further undercutting probable cause, Rodriguez did not behave as one would expect a

25   fleeing suspect to behave:  he chose to open his door and start the interaction with the police.  *See*

26   BWC Video at 01:20–01:45.  Determinations of probable cause "must be based on commonsense

27   _____

28   [10] Moreover, the security surveillance video shows the suspect appeared to be shirtless when he
     ran into the hotel entrance.  *See* Doc. 22-5, Ex. 5, at 0:03.

1   judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 124–25.  Evasion of

2   police officers is a factor that is thought, in many cases, to support a finding of probable cause,

3   *see, e.g., id.*, but Rodriguez did the opposite of evade the officers.  The officers had announced

4   themselves by yelling "Police!" when they arrived on the third floor of the hotel and shouted

5   loudly to one another outside of Rodriguez's hotel room door.  BWC Video at 0:44–1:55.

6   Despite the officers' obvious presence outside his door, Rodriguez voluntarily opened it and

7   peered outside to ask what was going on.  *Id.*  Rodriguez's immediate, apparent confusion when

8   Glenn said, "That's him," and his questions about why he was being arrested, also undermine a

9   finding of probable cause.  BWC Video at 1:18–2:47.  These facts weigh against finding that

10  there was probable cause to arrest him for suspected criminal activity.

11       Lastly, Rodriguez was not out of breath or sweating when he opened his door.  *Id.* at

12  1:35–1:55.  The officers were looking for someone who, in a matter of a few minutes, had fled on

13  foot across a busy highway, down an embankment, through a parking lot, and into the hotel and

14  up multiple flights of stairs.  *See id.* at 0:00–1:35.  Nothing about Rodriguez's demeanor or his

15  interaction with the officers suggested that he had just done so.  This, too, weighs against a

16  finding of probable cause.

17       In sum, construing all disputed material facts in favor of Rodriguez, Glenn did not have

18  probable cause to arrest Rodriguez when he caused other officers to do so, and Glenn's actions

19  therefore violated Rodriguez's Fourth Amendment rights.

20                  **b.  Clearly Established Law**

21       The Court now turns to the second prong of the qualified immunity analysis: whether the

22  right at issue was clearly established.  As the Ninth Circuit has explained, once a court determines

23  that there "are material facts in dispute that, if proven, would establish a constitutional violation[,]

24  [t]he court must proceed to the second step to decide whether the violation was 'clearly

25  established . . . .'"  *Carley v. Aranas*, 103 F.4th 653, 660 (9th Cir. 2024).  "The law is clearly

26  established when precedent is 'clear enough that every reasonable official would interpret it to

27  establish the particular rule the plaintiff seeks to apply.'"  *Calonge*, 104 F.4th at 47 (quoting *D.C.*

28  *v. Wesby*, 583 U.S. 48, 63 (2018)).  "Although '[the Supreme] Court's caselaw does not require a

1   case directly on point for a right to be clearly established, existing precedent must have placed the

2   statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)

3   (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).  "The rule must be settled law, which means

4   it is dictated by controlling authority or a robust consensus of cases of persuasive authority."

5   *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (internal quotation marks omitted).  The

6   Court may "rely on the intersection of multiple cases when holding that a constitutional right has

7   been clearly established."  *Polanco v. Diaz*, 76 F.4th 918, 930 n.8 (9th Cir. 2023) (citing *Ioane v.*

8   *Hodges*, 939 F.3d 945, 957 (9th Cir. 2018) ("Taken together, the holdings from [four prior cases]

9   put the unlawfulness of [the officer's] conduct beyond debate.")).

10      At the time of this incident, it was clearly established that arresting a suspect without

11   probable cause violated the Fourth Amendment.  In *United States v. Ricardo D.*, 912 F.2d 337

12   (9th Cir. 1990), the Ninth Circuit was confronted with similar circumstances and found probable

13   cause lacking.  There, Border Patrol agents observed a "young, thin [Mexican] man, not too tall"

14   run from a stopped van in a rural area and lost sight of him.  *Id.* at 338.  The agents learned

15   shortly thereafter that a truck driver had picked up a "young Mexican male" a half mile from

16   where the van was stopped and dropped him off at a payphone in a nearby town.  *Id.*  Sometime

17   after 11:15 p.m., the agents located the suspect crouching behind a tree near the pay phone where

18   he had been dropped off.  *Id.* at 33–39.  They arrested him, and afterward, he admitted that he was

19   the person who had run from the van.[11]  *Id.*

20      The Ninth Circuit held that, under these circumstances, the officers did not have probable

21   cause to arrest.  *Id.* at 342.  First, the Ninth Circuit explained that "the only knowledge possessed

22   by the officers was that a 'young, thin [Mexican] man, not too tall' had run from a van containing

23   marijuana."  *Id.*  This general description provided little support in the probable cause analysis.

24   *See id.*  Second, "[i]n a location only thirty miles north of the Mexican border, it can hardly be

---

26   [11]  "Because [the court] held that [the suspect] was under arrest when [the agent] arrived to
question him, [the suspect's later] admission [could not] be relied on to establish probable cause."

27   *Id.* at 342 n.3 (citing *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1298 (9th Cir. 1988)
(initial seizure cannot be justified by information obtained as a result of that seizure)).

28

1    said that the presence of a young, Mexican male is highly unusual." *Id.*  Additionally, although

2    the suspect was engaged in odd behavior for the time of day – crouching behind a tree – he did

3    not attempt to flee. *Id.*  On these facts, "there was insufficient information to lead a reasonable

4    person to believe that [the suspect] had committed a criminal offense." *Id.*

5        On the facts assumed to be true for purposes of this motion, like in *Ricardo D.*, Glenn did

6    not get a clear look at the suspect and only possessed a very general description – that he was an

7    adult Hispanic male wearing a black t-shirt and shorts.  *See id.*  As noted, "it can hardly be said

8    that" those demographic characteristics are "highly unusual" for the location of the arrest.  *See id.*

9    And although it was late at night and the arrest occurred near where the suspect had last been

10   seen, *see id.*,[12] Rodriguez did not attempt to evade the officers.  In fact, he did the opposite when

11   he took the initiative to open his door to ask what was going on.

12       More importantly, this case is rife with countervailing evidence that does not support

13   probable cause.  *See Lopez*, 482 F.3d at 107; *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir.

14   2003) ("An officer is not entitled to a qualified immunity defense . . . where exculpatory evidence

15   is ignored that would negate a finding of probable cause." (citing *Kuehl v. Burtis,* 173 F.3d 646,

16   651 (8th Cir. 1999)).  Although Rodriguez was in the hotel, which the suspect had last been seen

17   entering, there was no reason for Glenn to believe that the suspect might be a guest at the hotel.

18   The suspect had, after all, lost control of and crashed a stolen vehicle into a traffic barrier in the

19   middle of a highway adjacent to the hotel, after a high-speed freeway chase.  It would have been

20   quite a coincidence if the suspect, after driving for several miles at high speeds into oncoming

21   traffic on the freeway, had crashed into the highway median just a short distance from the hotel

22   where he was a paying guest.  Had the suspect taken the exit, parked the vehicle, and then run

23   into the hotel, it would have been reasonable to assume that he might be a paying guest there –

24

25   _____

26   [12]  While the suspect arrested in *Ricardo D.* was located further from the scene from which he had
     initially fled, the court noted that "the location of the [arrest] was rural and there were no other
27   people in the area when the officers pulled up."  *Ricardo D.*, 912 F.2d at 340.  In this case, the
     suspect was last seen in a heavily populated area with numerous places to run and hide.  The
28   relatively shorter distance between the place the suspect had last been seen and the place of arrest
     should therefore be given little significance.

1    but that is not what happened.

2       Given the circumstances known to Glenn at the time and considering the facts in the light

3    most favorable to Rodriguez, Glenn would have been aware that there was no probable cause to

4    arrest Rodriguez, a guest at the hotel.  This conclusion is also supported by the facts that:  (1)

5    Rodriguez was not out of breath or sweating like Glenn when he was arrested; (2) he was not

6    wearing the clothing the suspect had last been spotted wearing only a minute or two earlier; (3)

7    after his initial identification, Glenn expressed doubt at the scene about whether Rodriguez was

8    the suspect and could not recall specific features of the suspect; and (4) Rodriguez expressed

9    confusion as to why he was being arrested and, once Glenn explained what he believed,

10   Rodriguez immediately and adamantly denied any involvement.  *See* BWC Video at 1:29–2:39.

11   Accordingly, Glenn is not entitled to qualified immunity.

12                  **2.  Officers Trent Alexander and Tyler Schleicher**

13      Defendant officers Alexander and Schleicher also argue they are entitled to qualified

14   immunity.  *See* MSJ at 26–27.  Given that Alexander and Schleicher were not present during the

15   moment of arrest and were entitled to rely on Glenn's statements and his identification of

16   Rodriguez as the suspect at the scene, the Court concludes that they are entitled to qualified

17   immunity.

18      The Ninth Circuit has explained that

19          [e]ffective and efficient law enforcement requires cooperation and
            division of labor to function. For that reason, law enforcement
20          officers are generally entitled to rely on information obtained from
            fellow law enforcement officers. . . . We recently reaffirmed this
21          principle in *United States v. Jensen,* 425 F.3d 698 (9th Cir. 2005),
            where we . . . emphasized that an officer "was entitled to rely on the
22          observations and knowledge of the others, even though some of the
            critical information had not been communicated to him."

23

24   *Motley v. Parks*, 432 F.3d 1072, 1081–82 (9th Cir. 2005), *overruled on other grounds by United*

25   *States v. King*, 687 F.3d 1189 (9th Cir. 2012).

26      Officers Alexander and Schleicher were not present when Rodriguez was arrested, and

27   they did not have before them Glenn's body camera video, which appears to show that Rodriquez

28   was not out of breath or sweating.  *See* BWC Video at 01:31–01:45.  In fact, Glenn told them that

1   Rodriguez *was* out of breath and sweating when Rodriguez opened the hotel room door.[13]  *See id.*

2   at 5:37–5:52.  This was significant information for Alexander and Schleicher at the scene because

3   the officers were looking for someone who had run from the scene of the crash and up multiple

4   flights of stairs.  To any reasonable officer, it would be incredibly suspicious if Rodriguez had

5   emerged from a hotel room out of breath at 3 a.m. shortly after the suspect ran into the hotel.

6   Officers Alexander and Schleicher were entitled to rely on this information and Glenn's

7   identification of Rodriguez in making their assessment as to whether there was probable cause.

8   *See Motley*, 432 F.3d at 1081–82; *Zoellner v. City of Arcata*, 588 F.Supp.3d 979, 995 (N.D. Cal.

9   2022).

10       Glenn also told them that, "If you go up to [Rodriguez's] room, there's shorts in the

11  corner, tennis shoes in the corner.  Everything's changed out."  BWC Video at 5:37–5:59.  Given

12  that officers Alexander and Schleicher were not present at the moment of arrest, they did not

13  know that Glenn learned this information subsequent to the arrest.  They were also entitled to rely

14  on this information when making their assessment of probable cause.

15       Furthermore, Glenn told them, "We weren't saying a word [when Rodriguez] came out of

16  his room," *see id.* at 5:43–5:50, which could imply that Rodriguez did not know that the officers

17  were outside of his door when he opened it.  This is significant because, as explained previously,

18  the fact that Rodriguez knew the officers were outside his door and willingly opened it to ask

19  what was going on, thereby creating the encounter with the police, tends to undercut Glenn's

20  basis for finding probable cause.  *See Wardlow*, 528 U.S. at 124–25.

21       Lastly, Alexander and Schleicher showed up in the hallway after Rodriguez had already

22  been arrested, and Glenn looked at Rodriguez and said, "That's him.  That's the dude that ran

23  from me."  BWC Video at 02:22–02:27.  Alexander and Schleicher would have been unaware of

24  how clearly Glenn had been able to see the suspect as he ran through the parking lot, so "absent

25  _____

26  [13]  To the extent Rodriguez argues that Glenn intentionally misrepresented this fact to other
    officers, this is a credibility determination that must be made by a jury.  *Anderson*, 477 U.S. at
27  255 ("Credibility determinations . . . [are a] jury function[], not those of a judge [when] he is
    ruling on a motion for summary judgment . . . .").  The jury will also presumably have the body
28  camera video before it in evaluating the reasonableness of the witnesses' perceptions.

1   additional or different knowledge on" their part, they were entitled to rely on Glenn's observation

2   that Rodriguez was the suspect.  *Zoellner*, 588 F.Supp.3d at 995.

3          Although Alexander and Schleicher should have recognized that it would be highly

4   unlikely that the suspect fleeing after a car crash following a high-speed freeway chase would

5   fortuitously have happened to crash into the freeway median only a few hundred feet from a hotel

6   where he was a paying guest, this does not outweigh all of the information from Glenn that they

7   reasonably relied on in making their assessment of whether there was probable cause.  They were

8   entitled to rely on the following information Glenn conveyed: (1) that Rodriguez was "the

9   [suspect] who ran" from him, *see* BWC Video at 02:22–02:27; (2) that Rodriguez was out of

10  breath when he opened his door, *see id.* at 5:37–5:52; (3) that the officers were not speaking when

11  Rodriguez opened his door, *see id.*; and (4) that clothes similar to those of the suspect could be

12  found in Rodriguez's room, *see id.*  These considerations create a much different picture and are

13  "sufficient to lead a person of reasonable caution to believe that an offense ha[d] been . . .

14  committed by the person being arrested."  *Lopez*, 482 F.3d at 1072.  Accordingly, officers

15  Alexander and Schleicher had probable cause to arrest Rodriguez based on the information

16  presented to them at the time, and they are entitled to summary judgment based on qualified

17  immunity.

18         **d.  *Monell* Liability**

19         Defendants also move for summary judgment on Rodriguez's claim for *Monell* liability.

20  MSJ at 27–32.  The Supreme Court has recognized numerous theories that support municipal

21  liability pursuant to § 1983, but Rodriguez seeks to make out a claim only for failure to train.[14]

22  FAC ¶¶ 38–43.

23         A municipality's failure to train its agents or employees "may serve as the basis for

24  § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of

---

[14]  Defendants argue that the City is not liable under two other theories that may support
municipal liability, ratification and an unconstitutional policy, custom, or practice.  *See* MSJ at
29–30, 31–32.  These bases for *Monell* liability are not asserted in the pleadings, and the Court
therefore need not consider them here.  *See Pacific Radiation Oncology, LLC v. Queen's Medical
Center*, 810 F.3d 631, 635–36 (9th Cir. 2015).

1   persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388

2   (1989).  "Mere negligence in training" is insufficient to support a claim under *Monell*.  *Dougherty*

3   *v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Davis v. City of Ellensburg,* 869 F.2d

4   1230, 1235 (9th Cir. 1989)).  "To allege a failure to train, a plaintiff must include sufficient facts

5   to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training

6   policy that amounts to a deliberate indifference to constitutional rights; and (3) that the

7   constitutional injury would not have resulted if the municipality properly trained their

8   employees."  *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021).

9       Evidence to support the second element is entirely absent here.  With respect to this

10  element, "[a] pattern of similar constitutional violations by untrained employees is ordinarily

11  necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v.*

12  *Thompson*, 563 U.S. 51, 62 (2011) (quotations omitted); *see Flores v. Cnty. of Los Angeles*, 758

13  F.3d 1154, 1159 (9th Cir. 2014).  Rodriguez does not offer any evidence of similar constitutional

14  violations by officers employed by the City.  *See generally* Stmt. Mat. Facts; Pl.'s Resp. Def.'s

15  Facts.  And although defendants pointed this out in their motion, MSJ at 31, Rodriguez did not

16  attempt to rebut the assertion, *see* Opp'n at 2–8.  Accordingly, the City is entitled to summary

17  judgment on Rodriguez's *Monell* claim.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**IV.**    **Conclusion and Order**

For the reasons explained above:

1.   The motion for summary judgment is DENIED as to defendant Glenn;

2.   The motion for summary judgment is GRANTED as to defendants Alexander, Schleicher, and the City of Bakersfield;

3.   The Clerk of Court is directed to terminate this matter as to defendants Alexander, Schleicher, and the City of Bakersfield.

IT IS SO ORDERED.

Dated:    May 19, 2025

_____
UNITED STATES DISTRICT JUDGE

32